**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY LAURO, | ) | CASE NO. 5:16CV00604 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Anthony Lauro ("Plaintiff" or "Lauro"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), and 423 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

## I.   PROCEDURAL HISTORY

In August 2012, Lauro filed applications for POD and DIB**,** alleging a disability onset

date of May 24, 2008[1] and claiming he was disabled due to "sprain lumbar region and herniated disc L4-L5."  (Transcript ("Tr.") 16, 174, 215.)  The applications were denied initially and upon reconsideration, and Lauro requested a hearing before an administrative law judge ("ALJ").  (Tr. 16, 135-138, 142-149.)

On October 21, 2014, an ALJ held a hearing, during which Lauro, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 43-96.)  On December 18, 2014, the ALJ issued a written decision finding Lauro was not disabled.  (Tr. 16-38.)  The ALJ' s decision became final on January 17, 2016, when the Appeals Council declined further review. (Tr. 1-6.)

On March 11, 2016, Lauro filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 14, 15.) Lauro asserts the following sole assignment of error:

(1)     The ALJ erred by relying upon vocational testimony that is subject to multiple interpretations.

(Doc. No. 12.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

---

[1] Lauro filed a previous application for POD and DIB in July 2005, alleging disability beginning January 26, 2005.  (Tr. 100.)  The application was denied initially and upon reconsideration.  Lauro requested a hearing, but then knowingly and voluntarily waived in writing his right to personally appear and testify.  (*Id*.)  On September 4, 2008, the ALJ determined Lauro was not disabled from January 26, 2005 through the date of the decision.  (Tr. 100-106.)  In the instant case, the ALJ determined that "the period from [Lauro's] alleged onset of disability, May 24, 2008, and continuing through September 4, 2008, the date of the prior ALJ's decision, is dismissed under principles of administrative *res judicata*." (Tr. 37.)  Thus, the ALJ found that "September 5, 2008 will be reflected in this decision as the earliest date for considering the issue of disability."  (Tr. 17.)

2

Lauro was born in October 1967 and was forty-seven (47) years-old at the time of his administrative hearing, making him a "younger" person under social security regulations.  (Tr. 36.)  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  He has a high school education and is able to communicate in English.  (Tr. 36)  He has past relevant work as a verification worker, detailer, kitchen helper, and landscape laborer.  (Tr. 35-36.)

**B.       Relevant Medical Evidence**

In his Brief, Lauro states this "case is not based upon medical facts, or the ALJ's decision regarding the medical evidence."  (Doc. No. 12 at 2.)  He, therefore, provides a very limited discussion of the medical evidence.  (*Id*.)  The Commissioner, likewise, presents an abbreviated fact section, consisting of only three short paragraphs.  (Doc. No. 14 at 2-3.)  In light of the parties' representations that an exhaustive rendition of the medical evidence is not necessary, the undersigned will provide only a general overview of the medical evidence with a particular emphasis on Lauro's back and right leg pain.

On March 22, 2008, Lauro was injured while moving trees as part of his landscaping job.  (Tr. 278.)  He presented to the emergency room for treatment of lower back pain.  (*Id*.) Lauro denied any numbness, tingling, weakness, or paralysis, and stated the pain was nonradiating.  (*Id*.)  Examination revealed full range of motion in all extremities; intact motor, sensory and pulses; 5/5 motor strength; negative straight leg raise; and steady gait.  (Tr. 278, 280.)  Lauro did, however, have "some reproducible pain on palpation of paraspinal lumbar musculature."  (*Id*.)  The emergency room physician diagnosed acute lumbar strain, prescribed Percocet and Flexeril, and discharged Lauro in stable condition.  (Tr. 279.)

Lauro presented to Kevin J. Forsyth, M.D., who prescribed pain medication and

3

recommended physical therapy.  (Tr. 518-519.)  Lauro's back pain improved, and he returned to

work on a "light duty" basis beginning in April 2008.  (Tr. 512, 509, 505-506.)  Ultimately,

however, Lauro's back pain returned and he ceased working.  (Tr. 490, 503-504, 562.)  Lauro

then began a course of chiropractic treatment with Frank Dachtler, M.D., which did not provide

significant relief.  (Tr. 371.)

In June 2008, Lauro underwent an MRI of his lumbar spine.  (Tr. 282-283, 371-372.)

This MRI revealed (1) diffuse disc bulge and possible superimposed broad based right

paramedian herniation at L4-L5, resulting in moderate canal stenosis as well as narrowing of the

bilateral neural foramina more severe on the right; and (2) diffuse disc bulge with superimposed

left paramedian herniation at L5-S1, resulting in mild canal stenosis with bilateral neural

foramina narrowing, left side worse than right.  (Tr. 283.)

In June 2008, Lauro began treatment with orthopedist Paul Steurer, M.D.  (Tr. 560.)

Lauro presented regularly to Dr. Steurer, seeing him on at least twenty-eight occasions between

June 2008 and November 2012.  (Tr. 533-560, 574-575.)  Lauro generally complained of lower

back and right leg pain and tenderness, as well as occasional hip pain.  (*Id*.)  He was treated

conservatively with pain medication, physical and/or home therapy, and injections.  (*Id*.)  By

February 2011, Lauro's back pain was "under much better control," and he was looking for a

job.  (Tr. 537.)  In September 2012, however, he reported a "recurrence of his back pain," with

more soreness, tenderness and "some radicular component" as well as anterior thigh pain.  (Tr.

575.)  Dr. Steurer recommended medication, stretching, and therapy.  (*Id*.)

In January 2013, Lauro was involved in a motor vehicle accident.  (Tr. 577-580, 594-

596.)  He reported that "while he was driving he was hit on the rear passenger side of the

4

vehicle" and was "thrown side to side."  (Tr. 594.)  He did not have any immediate pain, but

experienced increasing pain on the right side of his neck and right flank area the following

morning.  (*Id*.)  Lauro complained of "increased pain with prolonged standing greater than 10

minutes and significant stiffness in his neck upon waking in the morning."  (*Id*.)  He stated "he is

mostly sedentary throughout the day with prolonged sitting for long periods of time."  (*Id*.)

Examination ten days after the accident revealed positive straight leg testing, as well as

tenderness on palpation "throughout the entire cervical spinous process into the upper thoracic

spinous process," as well as "hypomobility of the lumbar spine with spring test."  (Tr. 595.)

Lauro was referred for physical therapy twice per week.  (Tr. 596.)

Lauro returned to Dr. Steurer in March 2013.  (Tr. 619.)  He reported that physical

therapy had resolved his neck pain, but he had a "little bit of back pain."  (*Id*.)  Lumbar spine x-

rays were negative for any acute injury or fracture, though they did show a "small spur off of

L5."  (*Id*.)  Dr. Steurer advised Lauro to continue with physical therapy.  (*Id*.)  By May 2013,

Lauro was "back to pre-injury status."  (Tr. 618.)  Dr. Steurer advised him to complete his

physical therapy sessions, and then switch to home stretching and strengthening.  (*Id*.)  In

November 2013, Dr. Steurer noted "much less tenderness and soreness across the back" and

concluded that "physical therapy [had] definitely improved and helped things" for Lauro.  (Tr.

635.)

In June 2014, Lauro began treatment with Mark H. Orgel, M.D., stating he wanted to "get

off pain meds that he was put on many years ago due to low back injury."  (Tr. 625-627.)  Lauro

reported his back pain was "stable," but complained of worsening pain in his right leg.  (Tr.

625.) On examination, Lauro had a normal gait, normal neck range of motion, and a negative

straight leg raise test.  (Tr. 626.)  Dr. Orgel discussed with Lauro a plan to decrease his pain medication, and advised him to follow up in a month.  (Tr. 627.)

Lauro returned to Dr. Orgel in August 2014.  (Tr. 621-624.)  Lauro complained his leg pain was "getting a little worse, but it is not too bad."  (Tr. 623.)  On examination, Dr. Orgel noted normal gait, and normal range of motion in Lauro's lumbar spine, shoulders, elbows, hip, and knees.  (*Id.*)  He assessed chronic low back pain and lumbar radiculopathy, and advised Lauro to "continue with current treatment and exercise and stretch as much as tolerable."  (Tr. 624.)

**C.      State Agency Reports**

**1.          Physical Impairments**

On October 11, 2012, Lauro underwent a consultative examination with Morgan Koepke, M.D.  (Tr. 562-569.)  Lauro complained of chronic low back pain.  (Tr. 562.)  He reported difficulty climbing stairs and stated he could "sit for 1 hour if he is in a chair with lumbar support, stand for 30 minutes, walk 100 feet, and lift and carry 5- 10 [pounds]."  (Tr. 563.)  Lauro indicated his ability to bathe, cook, clean, dress, button, and unbutton were "intact."  (*Id.*)  Dr. Koepke noted Lauro "spent most of the time we were together standing and pacing the room though he did not appear to be particularly uncomfortable."  (*Id.*)  He also observed Lauro "was not particularly uncomfortable when I asked him to sit on the exam table for portions of the exam."  (*Id.*)

On examination, Dr. Koepke found Lauro's back was "nontender to palpation spinally or paraspinally," and there was no evidence of spasms.  (Tr. 563.)  Lauro had a normal gait and negative straight leg raise test bilaterally; however, he also had diminished deep tendon reflexes

6

in the patellae as well as decreased strength in the right lower extremity.  (Tr. 563-564.)  Range of motion within the cervical spine was within normal limits, but range of motion of the dorsolumbar spine was limited to 50 degrees of flexion, 10 degrees of extension, and 15 degrees of bilateral lateral flexion.  (*Id*.)  Lauro had full range of motion of his bilateral upper and lower extremities at all joints.  (*Id*.) He had full strength in his extremities, with the exception that he had mild (4+/5) weakness in his right lower extremity.  (*Id*.)

> Based on his examination, Dr. Koepke concluded as follows:
>
> I believe that [Lauro] can participate in light work duties.  He can stand up to 4 hours out of an 8 hour workday; however, he would need to alternate between sitting and standing every 30 minutes based upon his symptoms and he would need to have the appropriate lumbar back support if he is working from a seated position.  He can work over his head and has no limitations in movement of the arms.  He can lift up to 30 [pounds] with his arms only but if he is to lift this from the ground or use his lower back, he should not lift more than 10 [pounds].  Bending and twisting should also be kept to a minimum.  I do not believe, however, that he would be completely unable to participate in certain employment opportunities.

(Tr. 564.)

On November 5, 2012, state agency physician Teresita Cruz, M.D., reviewed Lauro's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 114-115.)  She concluded Lauro could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday.  (Tr. 114.)  Dr. Cruz also found Lauro had unlimited push/pull capacity and no postural, manipulative, or environmental limitations.  (*Id*.)

On January 24, 2013, state agency physician Jeffrey Vasiloff, M.D., reviewed Lauro's medical records and completed a Physical RFC Assessment.  (Tr. 128-129.)  He reached the same conclusions as Dr. Cruz.

### 2.      Mental Impairments

In January 2013, Lauro underwent a consultative examination with Joshua Magleby,

Ph.D.  (Tr. 582-587.)  He complained of depression and anxiety, as well as a previous history of

bipolar disorder.  (Tr. 584.)  Lauro reported "he is independent with [Activities of Daily Living],

without limitations or restrictions."  (*Id*.)  Specifically, he stated "he is capable of getting up in

the a.m., dressing, bathing, taking care of personal hygiene needs, managing money and

scheduling appointments."  (*Id*.)  Lauro complained of poor sleep due to leg pain, but described

his energy level as "fair" and "adequate for most routine daily tasks, with no complaints of

fatigue or loss of stamina."  (*Id*.)  He stated his social activities were "essentially nil."  (*Id*.)

On examination, Dr. Magleby noted Lauro's posture was normal and upright, and his gait

was "normal and unencumbered, although he carried a cane to assist with walking when

necessary."  (Tr. 584-585.)  Dr. Magleby remarked that Lauro "stood throughout the evaluation

due to claimed back pain."  (Tr. 585.)  Lauro was alert and oriented, with appropriate eye contact

and normal thought content.  (Tr. 584-585.)  Dr. Magleby found Lauro's ability to understand

and comprehend simple language was good, and his ability to understand more complex

directions and language was fair.   (Tr. 585.)  Lauro's affect was "somewhat flat," and his mood

was described as "generally 'down' and 'agitated,' with some anxiety but no marked mood

swings."  (*Id*.)  Psychological testing was not conducted, but Dr. Magleby concluded Lauro's

intelligence "appears low average" and his memory functions "appeared to be commensurate

with intelligence."  (Tr. 586.)

Dr. Magleby diagnosed (1) mood disorder, not otherwise specified ("NOS"); (2)

adjustment disorder unspecified, chronic; (3) cannabis dependence in sustained full remission;

and (4) personality disorder NOS [antisocial, obsessive-compulsive, and avoidant traits].  (*Id.*)

He assessed a Global Assessment of Functioning[2] of 55, indicating moderate symptoms.  (*Id.*)  In

terms of his functional assessment, Dr. Magleby concluded that Lauro's abilities to (1)

understand, remember and carry out simple oral instructions was "similar compared to adults the

same age;" (2) follow and carry out more complex types of directions was "fairly average;" (3)

maintain attention and concentration was "fairly similar compared to adults the same age,"

although his ability to perform multi-step tasks "appeared somewhat impaired for age

expectations;" (4) relate to others, such as peers, fellow workers, and/or supervisors "appeared to

be somewhat impaired;" and (5) withstand the mental/psychological stress and psychological

pressures associated with day to day work activity "appears somewhat impaired, mostly

compromised by mood dysregulation, adjustment difficulties, lack of sleep, and maladaptive

personality traits."  (Tr. 587.)

   In March 2013, state agency psychologist Katherine Fernandez, Psy.D., reviewed

Lauro's medical records and completed a Mental Residual Functional Capacity ("RFC")

Assessment.  (Tr. 129-131.)  Dr. Fernandez found Lauro was moderately limited in his abilities

to (1) understand, remember, and carry out detailed instructions; (2) maintain attention and

concentration for extended periods; and (3) complete a normal workday and workweek without

---

[2] The GAF scale reports a clinician's assessment of an individual's overall level
of functioning.  An individual's GAF is rated between 0-100, with lower numbers
indicating more severe mental impairments.  A score between 51 and 60 indicates
moderate symptoms or moderate difficulty in social, occupational, or school functioning.
A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of
clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and
Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th
ed., 2013).

interruptions from psychologically based symptoms and perform at a consistent pace without an

unreasonable number and length of rest periods.  (Tr. 130.)  Dr. Fernandez found Lauro "can

sustain tasks in a relaxed setting with allowances for variable pace and productivity" with

"minimal outside distractions."  (*Id*.)  She further concluded Lauro was limited to "simple and

moderately complex routine task instructions," and able to "interact with others in the

completion of moderately complex tasks."  (Tr. 130-131.)

**D.**     **Hearing Testimony**

During the October 21, 2014 hearing, Lauro testified to the following:

- He injured his back in March 2008 while doing landscaping work.  (Tr. 50,55.)
  He returned to "light duty" work several weeks later but then re-injured his back
  on May 24, 2008.  (Tr. 55.)  He worked for one day in 2011 as a kitchen worker,
  but did not return to that job because he could not tolerate standing all day.  (*Id.*)
  Aside from this one day of work as a kitchen helper, he has not worked since
  May 2008.  (*Id.*)

- Prior to his 2008 back injury, he worked as a dishwasher, boat detailer, and
  laborer.  (Tr. 55-57.)  Each of these jobs involved a great deal of standing,
  lifting, bending, squatting, pushing and/or pulling.  (*Id.*)  He also worked for
  several years as "verifications worker," i.e., he verified credit card information.
  (Tr. 57-59.)  This was primarily a "sitting job," although he was required to lift
  full paper boxes and climb stairs on occasion.  (*Id.*)

- As a result of his 2008 injury, he suffers from lower back pain and sciatic pain
  in his right leg.  (Tr. 51-52.)  The sciatic pain extends to just above his right
  knee, and sometimes continues to the top part of his right foot.  (Tr. 51, 65.)  His
  treatment has consisted of pain medication, injections, and physical therapy.
  (Tr. 61-62, 64.)

- He was in a motor vehicle accident in January 2013.  (Tr. 62.)  He was in the
  driver's seat when his car was hit broadside on the passenger side.  (*Id*.)  The
  accident "just aggravated everything."  (*Id*.)  He was in physical therapy for
  several months after the accident.  (*Id*.)

- He prefers to stand because sitting puts a strain on the nerve on his lower right
  side.  (Tr. 52.)  It is difficult for him to stand in one place for a long period of
  time, however.  (*Id*.) He prefers to be able to move around.  (*Id*.)  When asked

how long he could remain on his feet while "shifting, milling around a little bit," he said "a couple hours" but clarified he would need to squat down sometimes. (Tr. 67.) He stood for the duration of the hearing, which lasted for an hour.

- Sitting causes pain on his right side.  (Tr. 60.)  He can only sit for a few minutes before having to change position.  (*Id.*)  He sits in a "special chair" every evening from 7 to 9 p.m., but has to get up every 10 to 15 minutes to stretch and walk around a little bit.  (Tr. 52.)  He has a special pillow on the chair that helps alleviate his back pain.  (Tr. 53.)  He does not sit during the day.  (*Id.*)

- The most he can lift is a gallon of Gatorade.  (Tr. 67.)

- His pain is aggravated by bending, squatting, sitting for too long, and standing for too long.  (Tr. 52, 60-61.)  Cold temperatures also worsen his pain.  (Tr. 66.)

- He also experiences some "bipolar symptoms."  (Tr. 72.)  He "feels funny" and "there's a lot of things [he doesn't] really remember."  (*Id.*)  He lost his job as a detailer because he was "calling off too much" due to his bipolar issues.  (Tr. 72-73.)  He was taking medication for this condition, but it "started to make him feel worse."  (*Id.*)  He was admitted for in-patient psychiatric care for "a few weeks" in the past.  (Tr. 71.)

- He lives with his mother.  (Tr. 68.) He can shave and take care of most of his personal needs, with the exception of cutting his toenails. (Tr. 60-61.)  It hurts his back to bend over to cut his nails, so his mother does that for him.  (Tr. 61.)  His mother does the cooking and takes out the garbage.  (Tr. 76-77.)  He rinses the dishes, but his mother cleans them.  (*Id.*)  He drives a couple times per week, and it does not cause him any back or leg pain.  (Tr. 53.)

The VE testified Lauro had past work as a landscape laborer (unskilled, SVP 2, heavy); kitchen helper (unskilled, SVP 2, medium but performed as heavy); detailer (semi-skilled, SVP 4, medium but performed as heavy); and verification worker (semi-skilled, SVP 3, sedentary but performed as medium).  (Tr. 82-84.)  The ALJ then posed the following hypothetical question:

At this time, sir, I'd ask you to assume a hypothetical individual with the past jobs that you just described.  I'd further ask you to assume a hypothetical individual who is limited to the following: the hypothetical individual would fall within the exertional category of light with the following further restrictions. The hypothetical individual would be limited so far that they would only occasionally be required to climb ramps and stairs, never climb ladders, scaffolds, or ropes, occasionally balance, occasionally stoop, occasionally kneel

11

and crouch, but never crawl.  The hypothetical individual would be restricted
from hazards such as heights or machinery, but would be able to avoid ordinary
hazards in the work place such as boxes on the floor, doors ajar, approaching
people or vehicles.  The hypothetical individual would be limited to simple tasks,
limited to routine and repetitive tasks, would be limited to – and so far they
would only occasionally be required to interact with supervisors, co-workers, or
the public.  The hypothetical individual would – strike that, but that would be the
restrictions for the first hypothetical.

(Tr. 84-85.)

The VE testified the hypothetical individual would not be able to perform Lauro's past

work, but would be able to perform other representative jobs such as marker (light, unskilled);

cafeteria worker/attendant (light, unskilled, SVP 2); inspector and hand packager (light,

unskilled, SVP 2).  (Tr. 85-86.)

The ALJ then posed a second hypothetical, as follows:

For the second hypothetical, a hypothetical individual who has the same
restrictions as in the first, however, the hypothetical individual would require a
sit, stand option which would allow the individual to sit or stand alternately at
will provided that they are not off task more than 10 percent of any given
workday.  With that further restriction, would a hypothetical individual be able to
perform any of the sample jobs offered in response to the first hypothetical?

(Tr. 86-87.)  The VE responded as follows:

The individual would be able to perform two of those jobs, your honor, that
would be the job of marker and hand packer.  Provided that with the sit, stand
option that individual could tolerate standing or sitting for periods of time of at
least 15 minutes.  If an individual had to alternate standing and sitting for five
minutes at a time, I would not be able to identify any jobs, your Honor.

(Tr. 87.)  The VE further explained that, with the sit/stand option, the number of marker and

hand packer jobs would be lessened but by "no more than about 10 percent."  (*Id*.)  The VE also

identified a third job "that would meet the above hypothetical at the sedentary level," i.e., the job

of document preparer (sedentary, unskilled, SVP 2).  (Tr. 88.)

The ALJ then posed a third hypothetical that was the same as the second but added the limitation that the hypothetical individual "would need to avoid extreme exposure to the cold, so they would be working indoors."  (Tr. 89.)  The VE testified such an individual could perform the jobs identified in response to the second hypothetical.  (*Id.*)

The ALJ then posed a fourth hypothetical that was the same as the third but added the limitation that the hypothetical individual "would find themselves to be off task 25 percent of any given workday" due to "issues stemming from ongoing and unrelenting pain that the individual may be experiencing."  (Tr. 89.)  The VE testified that such a hypothetical individual would not be able to perform either the previously identified jobs, or any work in the national economy.  (Tr. 89-90.)

The ALJ then posed a fifth hypothetical that was the same as the third but added the limitation that the hypothetical individual would fall in the exertional category of sedentary.  (Tr. 90.)  The VE testified that such a hypothetical individual could perform the jobs of document preparer (sedentary, unskilled, SVP 2); surveillance monitor (sedentary, unskilled, SVP 2); and callout operator (sedentary, unskilled, SVP 2).  (Tr. 90.)

Lauro's counsel then asked the VE a series of questions.  He first asked whether any jobs would be available "if hypothetical number four indicated off task at an excess of 15 percent."  (Tr. 91.)  The VE testified there would be "no jobs" for such a hypothetical individual. (*Id.*) Counsel then asked the same question with regard to hypothetical number two, to which the VE again responded there would be no jobs.  (Tr. 93.)  Counsel next asked whether the previously identified jobs would be available for a hypothetical claimant that needed two additional breaks of 10 to 15 minutes in length, in addition to normal breaks.  (*Id.*)  The VE testified the previously

identified jobs would not be available.  (*Id*.)  Counsel then asked whether the previously

identified jobs would be available "if in any of the hypotheticals we added the hypothetical fact

that the claimant could not bend or could only bend very occasionally."  (*Id*.)  The VE testified

that such a restriction would impact the marker job, but not the other identified jobs.  (*Id*.)

Finally, counsel asked a series of questions regarding the ALJ's sit/stand option.  (Tr. 91-

92.)  The VE's testimony on this issue will be recounted in connection with Lauro's first

assignment of error.

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when

he became disabled; and (3) he filed while he was disabled or within twelve months of the date

the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way

of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v.*

*Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923

(6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in

"substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b)

*and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in

order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Lauro was insured on his disability onset date, September 5, 2008, and remained insured through June 30, 2014, his DLI. (Tr. 17.) Therefore, in order to be entitled to POD and DIB, Lauro must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2014.

2. The claimant did not engage in substantial gainful activity during the period

15

from September 5, 2008 through his date last insured of June 30, 2014 (20 CFR 404.1571 et seq.)

3.  Through the date last insured, the claimant had the following severe impairments: lumbar sprain, degenerative disc disease ("DDD"), and disc herniations at L4-L5 and at L5-S1; antisocial personality disorder and personality disorder, "NOS;" and an affective disorder, diagnosed as both chronic adjustment disorder and mood disorder, NOS (20 CFR 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he was further limited as follows:
    – Could occasionally climb ramps and stairs but could never climb ladders, ropes or scaffolds;
    – Could only occasionally balance, kneel, stoop, or crouch but could never crawl;
    – Was restricted from hazards like heights or machinery, but was able to avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or approaching people or vehicles;
    – Needed to avoid extreme exposure to cold;
    – Required a "sit/stand option" that would allow him to alternate positions between sitting and standing at will but not to such a frequency that he would be off task for more than 10% of the work period;
    – Was able to perform only simple, routine, and repetitive tasks; and
    – Could only occasionally interact with supervisors, co-workers, and the public.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on October 11, 1967 and was 46 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant was not under a disability, as defined in the Social Security Act, at any time from September 5, 2008 through June 30, 2014, the date last insured (20 CFR 404.1520(g).

(Tr. 16-38.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

17

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307

18

(7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

*Step Five*

In his sole assignment of error, Lauro argues remand is required because the ALJ relied upon vocational testimony that is "subject to multiple interpretations." (Doc. No. 12 at 6.)  He first maintains the VE's testimony did not directly respond to the hypothetical posed by the ALJ with regard to the sit/stand option.  Specifically, Lauro asserts that, while the ALJ's hypothetical asked whether jobs were available for an individual needing an "at will" sit/stand option, the VE answered the question in terms of availability of jobs for an individual that could tolerate standing or sitting for periods of time of at least 15 minutes.  Lauro argues a restriction to an "at will" sit/stand option is not consistent with a restriction to alternating position every 15 minutes and, therefore, the VE did not directly answer the ALJ's question.

Lauro argues this is particularly problematic because, on cross-examination, the VE testified that a "true 'sit/stand option at will' produces no available jobs."  (*Id*. at 7.)  Lauro asserts that "at best for Defendant, the [VE's] testimony is subject to two interpretations: 1) jobs can be performed if a person alternates every fifteen (15) minutes (Tr. 87-88); or 2) no jobs can be performed because of the pure 'at will' allowance (Tr. 93)."  (*Id*.)  Because the ALJ did not follow up to clarify this inconsistency, Lauro argues the VE's testimony was not sufficiently

clear enough for the ALJ to rely upon it to deny benefits.

The Commissioner asserts "the ALJ's substitution of 'at will but not to such a frequency that he would be off task for more than 10% of the work period,' for the VE's 15 minute minimum condition was not error in the first instance, much less harmful error."  (Doc. No. 14 at 6.)  First, the Commissioner argues that both the medical record and Lauro's own statements demonstrate his impairments, while severe, would not require him to switch positions more frequently than every fifteen minutes.  Second, the Commissioner maintains that Lauro does not argue his impairments would require him to alternate between sitting and standing at intervals of less than 15 minutes.  Finally, the Commissioner notes the ALJ expressly found Lauro "would not be doing this [i.e., alternating position] at every 5-10 minutes of work activity or that he would be resultantly off task for more than 10 percent of the work period."  (Tr. 32.)  Thus, the Commissioner argues "the ALJ's decision, read as a whole, confirms his determination that Plaintiff's impairments required a sit/stand option, but were not so severe that he needed to alternate between sitting and standing more frequently than 15 minutes at a time."  (Doc. No. 14 at 8.)

At step five of the sequential analysis, the burden of proof shifts to the Commissioner to show that there are jobs available in the economy that the claimant can perform.  *Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 391 (6th Cir.1999).  To satisfy this burden, the ALJ can rely on the VE's testimony, as long as the VE's testimony is in response to an accurate hypothetical of the claimant's physical and mental limitations.  *Varley v. Sec'y of Health & Human Servs*., 820 F.2d 777, 779 (6th Cir.1987).  In formulating the hypothetical, the ALJ needs to incorporate only those limitations that he or she accepts as credible.  *See Casey v. Sec'y of Health and Human*

20

*Services*, 987 F.2d 1230, 1235 (6th Cir. 1993).  *See also Kendrick v. Astrue*, 886 F.Supp.2d 627,

638-639 (S.D. Ohio 2012); *Dahlen v. Comm'r of Soc. Sec.*, 2014 WL 587139 at * 20 (N.D. Ohio

Feb. 14, 2014).

   Here, the ALJ determined at step two that Lauro had the following severe impairments:

lumbar sprain, degenerative disc disease, disc herniations at L4-L5 and L5-S1, antisocial

personality disorder, and affective disorder.  (Tr. 19.) After determining Lauro's impairments did

not meet or equal the severity of a listing, the ALJ proceeded to formulate the following RFC at

step four:

> After careful consideration of the entire record, the undersigned finds that,
> through the date last insured, the claimant had the residual functional capacity
> to perform light work as defined in 20 CFR 404.1567(b) except that he was
> further limited as follows:
>
> – Could occasionally climb ramps and stairs but could never climb ladders,
> ropes or scaffolds;
> – Could only occasionally balance, kneel, stoop, or crouch but could never
> crawl;
> – Was restricted from hazards like heights or machinery, but was able to avoid
> ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or
> approaching people or vehicles;
> – Needed to avoid extreme exposure to cold;
> – **Required a "sit/stand option" that would allow him to alternate
> positions between sitting and standing at will but not to such a frequency
> that he would be off task for more than 10% of the work period**;
> – Was able to perform only simple, routine, and repetitive tasks; and
> – Could only occasionally interact with supervisors, co-workers, and the
> public.

(Tr. 23-24.)  In making this finding, the ALJ first recounted Lauro's written allegations and

hearing testimony regarding his symptoms and impairments.  (Tr. 24-25.)  In particular, the ALJ

noted Lauro's testimony that he prefers to stand and, when he does sit, he needs to stand up

every 15 minutes in order to stretch.  (Tr. 25.)  The ALJ also detailed Lauro's testimony that he

can stay on his feet for "a couple hours," and remarked that "[a]t the hearing in this matter, the record will reflect that the claimant elected to stand for the duration of the hearing, the record of which lasted for just over one hour."  (Tr. 24-25.)

The ALJ then thoroughly discussed the medical evidence regarding Lauro's physical and mental impairments.  (Tr. 25-29.)  With regard to Lauro's lower back and right leg pain, the ALJ carefully recounted the evidence regarding Lauro's March 2008 accident, his June 2008 MRI, Dr. Steurer's treatment notes spanning from June 2008 to May 2014, Dr. Koepke's October 2012 consultative examination, Lauro's January 2013 motor vehicle accident, and Dr. Orgel's treatment notes.  (*Id.*)

The ALJ next analyzed Lauro's credibility, concluding his medically determinable impairments could reasonably be expected to cause the alleged symptoms but "his statements concerning the intensity, persistence, and limiting effects of these symptoms through the date last insured are not entirely credible" for a variety of reasons.  (Tr. 25.)  Of particular relevance herein, the ALJ explained as follows:

> In terms of the claimant's alleged functional difficulty in sitting for any more than 15 minutes at a time to stretch his back and alleviate pain in that area, or for no more than two hours in the evenings, the record does not support that allegation.  For, when asked by Dr. Koepke about his physical abilities, the claimant reported ability to sit for one full hour if the chair has a lumbar support (Ex. B6F/3).  Several months later, he conveyed to the physical therapist being 'mostly sedentary' and unable to engage in prolonged *standing* for any more than 10 minutes at a time due to the post-accident pain in his back and right leg (Ex. B10F/6).  To be sure, the claimant has been noted to 'prefer' to stand during several medical examinations but, when asked about why he could not sit or lie on his back in supine position, he reported the reason was an 'active pilonidal cyst' at the time– which was a generally short-lived medical issue that resolved after April 22, 2010 marsupialization surgery (Ex. B4F/21, 13; see also Ex. B3F/5).
>
> Regardless of these inconsistencies between the testimony and documentary

22

> record on this particular point, the claimant has had generally conservative,
> routine medical treatment for his pain that not only is itself insufficient to
> support the alleged degree of symptoms and functional limitations but also has
> been quite regularly documented by his treating physicians to have afforded
> substantial relief.

(Tr. 30)(emphasis in original).  The ALJ then discussed, at length, references in Dr. Steurer's and

Dr. Orgel's treatment notes documenting Lauro's generally improving symptoms with physical

therapy, exercises, injections, and pain medication.  (Tr. 30-31.) The ALJ then concluded as

follows:

> Based on these factors, the undersigned could not find the claimant's
> allegations more than partially credible and overall not supportive of an
> inability to perform a range of light work activity on a regular and continuing
> basis.  Some positive factors in the file lie in his obviously continued pain to
> some degree and that the pain increases in cold temperatures and when
> maintaining a static position for one hour or more at a time.  **However, the
> overwhelming evidence both in objective findings and these generally
> unsupportive credibility points does not persuade that he has had such
> unsuccessful treatment for pain control that he would be unable to sit for
> more than 15 minutes at a time without changing position.  Thus, the
> undersigned found that partially credible allegations supports the need to
> avoid extreme exposure to cold and the requirement to alternate positions
> between sitting and standing for pain relief, but not to the frequency that
> he would be doing this at every 5-10 minutes of work activity or that he
> would be resultantly off task for more than 10 percent of the work
> period.**

(Tr. 32) (emphasis added).

Lauro does not challenge the ALJ's credibility assessment, nor does he argue that the

RFC is not supported by substantial evidence.  Rather, Lauro argues remand is required because

the VE's testimony regarding the sit/stand option is ambiguous and "subject to multiple

interpretations."  *See Cunningham v. Comm'r of Soc. Sec.*, 2012 WL 1035873 at * 4 (N.D. Ohio

March 27, 2012 (finding "the consequences of any ambiguity in or confusion caused by the

hypothetical posed to the vocational expert must be born by the Commissioner.")

The Court finds remand is not required under the circumstances presented.  Reading the decision as a whole, it is clear the ALJ heard and understood the VE's testimony that (1) jobs would be available to the hypothetical individual "provided that with the sit, stand option that individual could tolerate standing or sitting for periods of time of at least 15 minutes," and (2) jobs would not be available if the hypothetical individual had to alternate standing and sitting for five minutes at a time.  (Tr. 87.)  The ALJ expressly acknowledges this distinction at several points in the decision, most notably when he finds Lauro would need "to alternate positions between sitting and standing for pain relief, but not to the frequency that he would be doing this at every 5-10 minutes of work activity or that he would be resultantly off task for more than 10 percent of the work period."  (Tr. 32.)  Thus, while the ALJ characterizes the sit/stand option as "at will," he tempered this with the restriction that it would not be "to such a frequency that [Lauro] would be off task for more than 10% of the work period."  Based on the ALJ's discussion of the issue, the Court finds the ALJ understood the 10% off task restriction to mean that Lauro would not be alternating positions at a frequency that would be work-preclusive according to the VE's hearing testimony.

Lauro argues, summarily, that "an off task restriction does not address the rate a person would be changing positions."  (Doc. No. 15 at 3.)  Here, however, the VE testified the jobs of marker and hand packer would be available so long as the hypothetical individual "could tolerate standing or sitting for periods of time of at least 15 minutes" and did not need to alternate standing and sitting every five minutes.  (Tr. 92.)  As set forth above, the ALJ clearly found Lauro was capable of sitting and/or standing for at least 15 minutes at one time.  It is also clear the ALJ saw no inconsistency between the RFC's restriction to "a sit/stand option that would

allow [Lauro] to alternate positions . . . but not to such a frequency that he would be off task for more than 10% of the workday" and the VE's testimony that jobs would be available to the hypothetical individual "provided that with the sit, stand option that individual could tolerate standing or sitting for periods of time of at least 15 minutes." (Tr. 87.) The Court finds that, under the circumstances presented, this was not an unreasonable conclusion and remand is not required due to any alleged ambiguity in the VE testimony.

Accordingly, Lauro's sole assignment of error is without merit.

### VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.


_____/s Jonathan Greenberg_____
Jonathan D. Greenberg
United States Magistrate Judge

Date: December 19, 2016

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**